F. PHILLIP HOSP, CA Bar No. 265225
phosp@foley.com
CASEY GENG, CA Bar No. 357270
casey.geng@foley.com
**FOLEY & LARDNER LLP**
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2418
Telephone: (213) 972-4500
Facsimile (213) 486-0065

STEPHEN A. MCCARTIN, TX Bar No. 13374700 (*pro hac vice* forthcoming)
smccartin@foley.com
BRANDON C. MARX, TX Bar No. 24098046 (*pro hac vice* forthcoming)
bmarx@foley.com
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

KIM P. GAGE, CA Bar No. 82051
kgage@cookseylaw.com
**COOKSEY TOOLEN GAGE DUFFY WOOG**
535 Anton Boulevard, Suite 1000
Costa Mesa, CA 92626-1977
Telephone: 714.431.1090
Facsimile: 714.431.1119

*Attorneys for Plaintiff*
DAIMLER TRUCK FINANCIAL SERVICES USA LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| DAIMLER TRUCK FINANCIAL SERVICES USA LLC,<br>*Plaintiff,*<br>v.<br>VANGUARD NATIONAL TRAILER CORPORATION and CIMC REEFER TRAILER, INC., a/k/a VANGUARD REEFER TRAILER, INC.,<br>*Defendants.* | Case No. 2:26-cv-3785<br>**COMPLAINT FOR:**<br>**(1) FRAUD;**<br>**(2) NEGLIGENT MISREPRESENTATION;**<br>**(3) DECLARATORY JUDGMENT;**<br>**(4) CONSPIRACY; and**<br>**(5) MONEY HAD AND RECEIVED** |

Plaintiff Daimler Truck Financial Services USA LLC ("**Daimler**") hereby brings this action against Defendants Vanguard National Trailer Corporation ("**Vanguard**") and CIMC Reefer Trailer, Inc., a/k/a Vanguard Reefer Trailer, Inc. ("**CIMC**" and, together with Vanguard, the "**Vanguard Parties**"). This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity between the parties as alleged below.

## PRELIMINARY STATEMENT

### I. Customary New Vehicle Financing

1. The distribution, sale, and financing of new vehicles normally works like this:

a. The manufacturer sells a new vehicle to a dealer (or reseller);

b. The dealer usually has a "floor plan" lender that has provided the dealer with a line of credit to finance the purchase vehicles from the manufacturer; before loaning the dealer money to purchase the vehicle, the floor plan lender often requires an unexecuted and undated manufacturer's certificate (or statement) of origin ("**MCO**") identifying and confirming the existence of the vehicle;

c. After the manufacturer is paid, it sends the dealer an executed and dated original MCO certifying that the vehicle has been transferred to, and has become the property of, the dealer;

d. The dealer then sells the vehicle to a customer; the customer often borrows money from his or her own lender to pay the dealer; the customer's lender requires a copy of the executed and dated MCO from the dealer before funding, which provides evidence that the dealer has the original MCO, owns the vehicle, and can sell the vehicle to the customer; and

e. After the dealer is paid by the customer's lender, the dealer sends the original MCO to the State to issue a certificate of title in the name of the customer, with his or her lender's lien note to perfect the lien.

2. Notably, under this structure, the dealer does not send the original executed MCO to the customer's lender, only a copy. The dealer keeps the original executed MCO to send to the State to obtain title for the customer.

## II. The Vanguard Parties and Their Fraudulent Scheme

3. The fraudulent scheme perpetrated by the KAL Entities, with the participation of the Vanguard Parties, can be summarized as follows:

a. The Vanguard Parties manufacture and sell trailers in North America, generally through dealers and resellers;

b. KAL Trailers & Leasing, Inc. ("**KAL Trailers**") was a licensed California dealer that purchased over one thousand (1,000) trailers from the Vanguard Parties;

c. The Vanguard Parties did not have a floorplan lender to use to pay the Vanguard Parties for the trailers sold to KAL Trailers on credit;

d. KAL Freight LLC ("**KAL Freight**"), a sister company of KAL Trailers, was a national trucking company that purchased trailers for use in its business operations from KAL Trailers (KAL Trailers and KAL Freight, together, the "**KAL Entities**");

e. The Vanguard Parties sold thousands of trailers to KAL Trailers on credit, essentially serving as both the manufacturer and floor plan lender to KAL Trailers. The Vanguard Parties assert that they retained title to the delivered trailers, until KAL Trailers paid them for the trailers;

f. KAL Freight borrowed millions of dollars from Daimler to purchase trailers from KAL Trailers. Daimler (like all lenders) required KAL Trailers to provide an executed and dated MCO copy for each trailer financed before funding to make sure that (i) the trailers had been transferred to KAL Trailer, (ii) KAL Trailers had the original MCO from the manufacturer, (iii) KAL Trailers could transfer ownership of the trailers to KAL Freight, and (iv) KAL Freight could pledge the trailers to Daimler to secure its purchase money loans;

g. In order to enable KAL Trailers to resell the trailers to its customers, the Vanguard Parties delivered executed, dated, and endorsed MCO copies to KAL Trailers when it sold and delivered trailers on credit so KAL Freight could provide MCO copies to its customers' lenders, including Daimler, to induce Daimler to extend purchase money loans secured by the trailers; and

h. The Vanguard Parties certify on the MCO copies that they had transferred ownership of the trailers to KAL Trailers on the date of the MCO when, in fact, they retained the original MCOs and now claim to retain title to the trailers. The Vanguard Parties participated and enabled the fraud upon Daimler, as they knew, or should have known, that Daimler and other lenders would rely on the MCO copies to extend purchase money loans.

4. Relying on these false representations by the Vanguard Parties, Daimler provided tens of millions of dollars of loans to KAL Freight to purchase over one thousand trailers from KAL Trailers. Daimler's purchase money loans to KAL Freight were secured by first priority liens on the trailers financed by Daimler, which are liens perfected by being noted on the titles issued by the State of California.

5. Unbeknownst to Daimler, KAL Trailers had not paid the Vanguard Parties and did not use all of the Daimler loan proceeds to pay the Vanguard Parties. Accordingly, the Vanguard Parties now claim, despite signing and delivering the MCO copies certifying otherwise, that title never passed to KAL Trailers, nor from KAL Trailers to its customer KAL Freight, and that all liens granted by KAL Freight to Daimler and other lenders on trailers for which the Vanguard Parties were never paid are void.

6. The Vanguard Parties fraudulently or, at a minimum, negligently and recklessly provided the dated and executed MCO copies to KAL Trailers which they knew, or should have known, would be relied upon by Daimler and other lenders to extend millions of dollars of purchase money loans to KAL Freight to purchase

trailers from KAL Trailers. They did so hoping that KAL Trailers would use the loan proceeds to repay the Vanguard Parties extension of credit to KAL Trailers.

7. Importantly, the State of California has issued certificates of title to all of the Daimler collateral in the name of KAL Freight, with Daimler noted as lienholder on the titles.

8. The Vanguard Parties participated in, and enabled, KAL Freight to perpetrate a fraudulent scheme which cost Daimler millions of dollars in loan losses. KAL Freight and KAL Trailers would not have been able to perpetrate the fraudulent scheme without the executed, dated and endorsed MCO copies provided by the Vanguard Parties. Daimler would not have extended loans to KAL Freight if it had known that KAL Trailers was not paying the Vanguard Parties and that the Vanguard Parties were asserting that they retained title to trailers which served as Daimler collateral. Daimler relied on the Vanguard Parties' false certifications and misrepresentations that the Daimler collateral had been transferred to, and had become the property of, KAL Trailers.

9. Accordingly, Daimler requests a money judgment against the Vanguard Parties for Daimler's loan losses attributable to the fraudulently obtained loans by KAL Freight, including accrued but unpaid interest, fees, expenses and punitive damages, all in amounts to be determined at trial.

10. If this Court does not award Daimler a money judgment for its loan losses caused by the Vanguard Parties conduct, Daimler alternatively requests the Court find that:

a. The Vanguard Parties should be equitably estopped from asserting superior title to the Daimler collateral due to their complicit and improper conduct that enabled KAL Trailers and KAL Freight to perpetrate their fraudulent scheme;

b. The Vanguard Parties' secret attempt to retain title to the Daimler collateral constitutes a security interest only, which was unperfected when Daimler perfected its security interest and, accordingly, the Vanguard Parties' security interests in the

Daimler collateral are subordinate to the first priority, properly perfected security interests of Daimler; and

c. The Vanguard Parties must turn over possession of all Daimler collateral, including proceeds from the sale, in their possession to Daimler which secured unpaid indebtedness due and owing by KAL Freight to Daimler.

## III. King Country

11. After executing sales orders, and after delivery of executed, dated and endorsed MCO copies to KAL Trailers, CIMC eventually figured out that it was not going to be paid by KAL Trailers and CIMC and (i) cancelled pending deliveries of 122 trailers to Kal Trailers (the "**Never Delivered Trailers**"), and (ii) repossessed 42 trailers previously delivered (the "**Repossessed Trailers**") (for a total of 164 trailers, which are included in Daimler collateral). California certificates of title to these 164 trailers have been issued in the name of KAL Freight (the purchaser from KAL Trailers), with Daimler's liens properly noted thereon by the State of California.

12. CIMC re-sold all forty two (42) of the Repossessed Trailer and fifty-five (55) of the Never Delivered Trailers (for a total of 97 trailers) to Crownfour, LLC, d/b/a King Country Trailer and Repair ("**King Country**") on credit, and re-created and delivered a second set of MCO copies to King Country (and again allegedly retaining title to secure payment by King County for the trailers) (the "**King Country Disputed Trailers**"). King Country then sold all 97 of the King Country Disputed Trailers to its customers and paid a portion of the sales proceeds to CIMC.

13. Daimler requests the Court find that Daimler possessed first priority, legally enforceable, liens on the King Country Disputed Trailers, and that Daimler is entitled to a money judgment against CIMC in the amount of all proceeds from the sale of Daimler's collateral which they have received from the sale of the King Country Disputed Trailers.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity between the parties.

15. This Court has personal jurisdiction over the Vanguard Parties because they have purposefully availed themselves of the privileges of conducting business in California and Daimler's claims arise out of or relate to the Vanguard Parties' conduct in this state.

16. Venue is proper in this District under 28 U.S.C. § 1391 (b) because a substantial part of the events alleged herein that give rise to the claims occurred in this judicial district.

## THE PARTIES

17. Daimler is a Delaware limited liability company with its members located in the country of Germany.

18. Vanguard is a Delaware company incorporated with its principal office located in the State of Indiana. Its registered agent is Corporation Service Company, 135 North Pennsylvania Street, Suite 1610, Indianapolis, IN, 46204.

19. CIMC is a company incorporated in Delaware with its principal office located in the state of Indiana. Its registered agent is Sun Shubin, 717 E. Quarry Rd., Monon, IN 47959-8007.

## FACTUAL BACKGROUND

### I. The Vanguard Parties

20. The Vanguard Parties manufacture and sell "dry van" and refrigerated (or "reefer") trailers, primarily to dealers to be held as inventory for resale to their retail customers in their normal course of business.

**II. The KAL Entities and Big Rig Entities**

21. KAL Trailers was a California-based licensed "dealer" that bought trailers from manufacturers (primarily from the Vanguard Parties) for resale in its normal course of business.

22. KAL Freight was a national trucking and logistics company, and the sister company to KAL Trailers (at all relevant times, both were 100% owned by Mr. Kalvinder Singh). KAL Freight purchased trailers from KAL Trailers for use in its business operations.

23. Big Rig Trailers and Leasing, Inc., Big Rig Tires and Services, Inc. and Big Rig Partz, Inc. (collectively, the "**Big Rig Entities**") are Canadian entities in the leasing, logistics and trucking business in Canada. At all relevant times, the Big Rig Entities were also 100% owned by Mr. Kalvinder Singh.

24. KAL Trailers and KAL Freight filed bankruptcy proceedings with the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division [Case No. 24-90614 (CML) (Jointly Administered)] on December 5, 2024. Their plans of liquidation have been confirmed, they have ceased operations, and have ceased to exist.

**III. Daimler**

25. Daimler is a U.S.-based national vehicle finance lender specializing in commercial trucks and trailers.

**IV. King Country**

26. King Country is a Texas trailer dealer and servicer that purchased ninety-seven (97) King Country Disputed Trailers (which were Daimler collateral) from the Vanguard Parties and re-sold them to its retail customers.

**V. Industry Standard Vehicle Finance Transactions**

27. It is helpful to review the normal and customary industry standard for the purchase, sale and financing of new vehicles and trailers to understand Daimler's

causes of action and disputes with the Defendants. The following is a normal and customary transaction in the industry:

a) <u>Manufacturer's Sale to Dealer -</u>

i. A manufacturer agrees to sell, and a dealer agrees to purchase, a newly manufactured trailer;

ii. The dealer normally has a line of credit or "floor plan" lender that provides a line of credit to the dealer to finance the dealer's inventory and purchases from the manufacturer;

iii. When a dealer orders a new trailer, the manufacturer prepares an <u>unsigned</u> and <u>undated</u> MCO, identifying the trailer, which is sent to the dealer's "floor plan" lender to confirm the trailer being financed exists;

iv. Upon receiving the unsigned and undated MCO, the dealer's "floor plan" lender advances the loan proceeds/purchase price to the manufacturer on behalf of the dealer to pay for the trailer and, in exchange, the manufacturer delivers the purchased trailer to the dealer, and <u>endorses, dates, signs</u> and delivers <u>the original MCO</u> to the dealer, certifying that the trailer has been transferred and has become the property of the dealer; and

v. The floor plan lender perfects its blanket lien on the dealer's inventory (including the purchased trailer) by filing a UCC-1 financing statement with the appropriate Secretary of State (not by noting its lien on the title, as no title is issued yet); accordingly, the floor plan lender's lien attaches to the trailer upon the manufacturer certifying that the trailer has been transferred and has become the property of the dealer.

b) <u>Dealer's Sale to Customer -</u>

i. The dealer then sells the trailer in the normal course of its business to its retail customers; a sale of inventory by a dealer is free and clear of the blanket lien of the floor plan lender;

ii. At this point <u>the dealer</u> has possession of the signed and dated <u>original</u> MCO; when the dealer sells the trailer to a customer, the customer often borrows money from its own vehicle finance lender; before funding the loan, the customer's lender requests

and receives a copy of the original, executed and dated MCO from the dealer, along with a copy of the Dealer's application for title to be issued in the name of the customer (the original MCO is retained by the dealer); and

iii. Upon receiving the purchase price from the customer, the dealer sends an application for title and the original MCO (executed and dated) to the State to issue a certificate of title in the name of the customer, with the lender's lien noted on the title.

28. Notably, under this structure, the customer's vehicle finance lender never receives the original MCO, but always receives a copy of the executed and dated MCO. The original MCO is retained by the dealer and sent to the State to issue title. MCOs are printed on special safety paper so that any copy will always read and show a watermark reflecting they are copies or void so there is only one original MCO in circulation (otherwise multiple titles could be requested with a single MCO).

**VI. Summary of the Fraudulent Scheme**

29. The Vanguard Parties manufacture and sell trailers primarily to dealers. KAL Trailers, a licensed dealer, purchased over one-thousand (1,000) trailers from the Vanguard Parties.

30. Normally, a dealer (like KAL Trailers) has a floor plan lender that loans the dealer money to pay for trailers purchased from the manufacturer. KAL Trailers had a very small floor plan credit limit with its floor plan lender which was insufficient to finance the purchase of over one-thousand trailers from the Vanguard Parties. Accordingly, Daimler learned, after the fact, that the Vanguard Parties sold over one-thousand trailers to KAL Trailers over a two (2) year period on credit, effectively serving as the secret floor plan lender for KAL Trailers. The Vanguard Parties now assert that they retained title to trailers which KAL Trailers failed to pay them for, even though those trailers now serve as security for the repayment of KAL Freight's indebtedness to Daimler (the mechanics of which are explained in more detail below). The Vanguard Parties' alleged retention of titles directly conflicts with

the dated, endorsed and signed MCO copies they provided to KAL Trailers which contain a certification that the trailers had in fact been transferred to, and became the property of, KAL Trailers. The alleged retention of title was undisclosed to Daimler and the other secured lenders of KAL Freight (no UCC-1 was filed before Daimler and other lenders advanced funds), and it directly conflicts with the certifications of transfer provided to Daimler by the Vanguard Parties through the MCO copies.

31. The Vanguard Parties effectively provided KAL Trailers with floor plan financing by attempting to secretly retain title to thousands of trailers sold and delivered over time to KAL Trailers on credit. The Vanguard Parties then provided dated, endorsed and signed MCO copies to KAL Trailers with false, conflicting, and intentionally misleading certifications that they had transferred ownership of the trailers to KAL Trailers. The Vanguard Parties did this for the express purpose of inducing Daimler and other secured lenders to extend loans to KAL Freight to purchase the trailers from KAL Trailers knowing that they would only extend loans if they had evidence that KAL Trailer owned the trailer and could transfer ownership to KAL Freight.

32. Why would the Vanguard Parties participate in or enable this fraud by providing the MCO executed copies to KAL Trailer before being paid? The Vanguard Parties participated in or enabled this fraud because (i) they were able to sell more trailers on credit and record more sales revenue, and (ii) they expected the fraudulently obtained loan proceeds from Daimler to be used by KAL Trailers to pay the Vanguard Parties. When KAL Trailers diverted the loan proceeds and failed to pay the Vanguard Parties, the Vanguard Parties for the first time in the loan bankruptcy proceeding of the KAL Entities disclosed that they retained title to the trailers, no ownership passed to KAL Freight, and therefore all liens pledged to Daimler by KAL Freight are void.

33. Daimler provided tens of millions of dollars of purchase money secured loans to KAL Freight to purchase trailers from KAL Trailers, directly relying on the

false certifications of transfer to KAL Trailers, and relying on the Vanguard Parties' entrustment of hundreds of trailers over two (2) years to KAL Trailers. The State of California issued titles for all of the Daimler collateral to KAL Freight with Daimler's liens properly noted and perfected on the titles.

34. As discussed above, the Vanguard Parties (the manufacturers) fraudulently (or, at a minimum, negligently and recklessly) sent copies of dated, endorsed and signed MCOs to KAL Trailers (a dealer) fraudulently certifying that the trailers had been transferred to and had become the property of KAL Trailers. The Vanguard Parties deliberately concealed that they secretly retained the original MCOs and claimed to retain title to secure credit extended to KAL Trailers. The Vanguard Parties knew, or should have known, that KAL Trailers would send the dated, endorsed and signed MCO copies to KAL Freight's lenders (*e.g.* Daimler), so the lenders would believe the trailers were the property of KAL Trailers and could be sold to KAL Freight and legally pledged to secure KAL Freight's financing. Daimler relied on these fraudulent MCOs to loan KAL Freight tens of millions of dollars to purchase the trailers from KAL Trailers. It is common industry practice, and the Vanguard Parties knew, or should have known, that the lenders would rely on these MCO copies, indicating that the originals were in the possession of KAL Trailers, to extend loans secured by the trailers. The Vanguard Parties repeatedly and systematically continued for over two (2) years to deliver hundreds of trailers to KAL Trailers on credit despite KAL Trailers outstanding indebtedness for the purchase price growing to tens of millions of dollars, while secretly claiming to retain title to the trailers with no UCC-1 filed of record to put lenders on notice of their asserted interest.

35. If the Vanguard Parties had (i) not sent dated, endorsed and signed copies of the MCOs with the false certification that the trailers had been transferred to KAL Trailers, and (ii) not continued to entrust and deliver trailers to KAL Trailers

(without being paid for approximately two (2) years). Daimler would not have loaned KAL Freight money to purchase the trailers that serve as the Daimler collateral.

## VII. The Vanguard Parties' MCOs

36. The dated, endorsed and signed MCO copies provided to KAL Trailers specifically provided:

> **"I, the undersigned authorized representative of the company, firm or corporation named below, hereby certify that the new vehicle described above is the property of said company, firm or corporation and is transferred on the above date and under the Invoice Number indicated to the following distributor or dealer. [(Emphasis Added).]**
>
> **KAL TRAILERS & LEASING, INC.**
> **11184 Almond Ave**
> **Fontana, CA 92337**
>
> **It is further certified that this was the first transfer of such new vehicle in ordinary trade and commerce."**

## VIII. The KAL Entities' Bankruptcies and the Big Rig Entities' Insolvency Proceedings

37. On December 5, 2024, the KAL Entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

38. The non-debtor affiliates of the KAL Entities include the Big Rig Entities, which are subject to their own insolvency proceedings in Canada. The Big Rig Entities have also been accused of significant fraud in Canada. Grant Thornton Limited, the receiver appointed in a Canadian involuntary insolvency proceeding against the Big Rig Entities (the "**Canadian Proceeding**") and the foreign representative of Big Rig Trailers & Leasing Inc.'s chapter 15 proceeding pending before the United States Bankruptcy Court for the Central District of California, *In re Big Rig Trailers & Leasing Inc*, Case No. 24-bk-15309-MH, have been conducting extensive investigations into the Big Rig Entities' activities and have alleged that such entities engaged in significant fraud.

39. The Bankruptcy Court in the KAL Chapter 11 Cases entered orders terminating the automatic stay, allowing Daimler to take possession of all of its collateral, and to exercise any and all rights and remedies under its loan documents and applicable non-bankruptcy law, as to its collateral, including collateral in the possession of third parties (including the Vanguard Parties). *See* Case No. 24-90614, Docket Nos. 762 and 770 (the "**Settlement Term Sheet Order**") ¶¶ 6 and 10.

**IX. CIMC's Wrongful Sale of Daimler Collateral to the King Country**

40. CIMC delivered hundreds of trailers to KAL Trailers over a period of approximately two (2) years on credit. CIMC eventually repossessed the Repossessed Trailers (42 trailers) sold to KAL Trailers on credit after (i) CIMC had delivered them to KAL Trailers, (ii) after CIMC had delivered executed and dated MCO copies to KAL Trailers, (iii) after KAL Trailers resold them to KAL Freight, and (iv) after KAL Freight borrowed the purchase price from Daimler and pledged the trailers to Daimler to secure its loan.

41. CIMC also canceled the sale and delivery of the Never Delivered Trailers (122 trailers) after CIMC provided KAL Trailers with dated, endorsed and signed MCO copies for each trailer, which KAL Freight used to fraudulently obtain secured loans from Daimler secured by the Never Delivered Trailers.

42. Ninety-seven (97) of the Repossessed and Never Delivered Trailers were sold to King Country (the "**King Country Disputed Trailers**"). King Country re-sold the King Country Disputed Trailers to its customers. Daimler asserts a first-priority security interest in all of these 97 King Country Disputed Trailers and the proceeds of the sales of its collateral. These trailers were titled in the name of KAL Freight, with Daimler's liens properly perfected on the certificates of titles.

43. The remaining sixty-seven (67) of the Never Delivered Trailers remain in the possession of CIMC.

**<u>FIRST CAUSE OF ACTION</u>**

**(Common Law Fraud – Against All Defendants)**

44. Daimler repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

45. During the course of the transactions described above, the Vanguard Parties made fraudulent and false statements of material facts, and intentional omissions of material facts, in order to induce Daimler to extend loans secured by liens on the Daimler collateral, causing economic damages to Daimler.

46. Specifically, the Vanguard Parties fraudulently represented that they had transferred the Daimler collateral to KAL Trailers, while secretly retaining the original MCOs and attempting to retain title to the Daimler collateral. The Vanguard Parties intentionally provided the dated, endorsed and signed MCO copies with full knowledge that Daimler and other lenders would rely on their certifications to provide purchase money loans secured by the Daimler collateral, which they expected KAL Trailers to repay the Vanguard Parties.

47. The Vanguard Parties knew these statements were false at the time the statements were made, and knew that their failure to disc lose their alleged retention of titles, were material at the time made. The Vanguard Parties now allege that they retained the MCO originals and title to the Daimler collateral for which they have not been paid and allege that they did not intend to transfer ownership until they were paid.

48. Daimler reasonably relied on the Vanguard Parties' misrepresentations and omissions, extending purchase money loans to KAL Freight secured by the Daimler collateral, relying on the dated, endorsed, and signed copies of the MCOs for the Daimler collateral.

49. Daimler is entitled to compensatory damages from the Vanguard Parties for its economic damages, measured by its loan losses on the fraudulently obtained

loans to KAL Freight in an amount not less than $46,772,200.00, plus accrued but unpaid interest, costs and attorney's fees, all in amounts to be determined at trial.

50. The Vanguard Parties are also liable for exemplary damages due to their fraud, malice and/or gross negligence in making fraudulent and false statements of material fact and intentionally omitting material facts.

51. Accordingly, Daimler requests a money judgment against the Vanguard Parties for its economic damages and for exemplary damages, all in amounts to be determined at trial.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation – Against All Defendants)

52. Daimler repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

53. The Vanguard Parties made representations in the course of their business and in specific transactions in which they had pecuniary interests by providing dated, endorsed and signed copies of MCOs to KAL Trailers for the purpose of inducing Daimler and other secured lenders to extend purchase money loans to KAL Freight to purchase the trailers from KAL Trailers.

54. The representations in the MCO copies conveyed false information for the guidance of Daimler and other secured lenders in their business transactions including, without limitation, false certifications that the Daimler collateral had been transferred to and was the property of KAL Trailers as of the specific dates listed in the MCO copies. The MCO copies contained an omission of material fact by omitting that the Vanguard Parties claimed to retain title to the Daimler collateral to secure their outstanding indebtedness.

55. The Vanguard parties did not exercise reasonable care or competence in conveying the false information in the MCO copies; to the contrary they expressly dated, endorsed and signed the MCOs without alteration or qualification, and provided copies of the same to KAL Trailers.

56. Daimler has suffered pecuniary loss including, without limitation, its loan losses on loans to KAL Freight in an amount not less than $46,772,200.00, by justifiably relying on the representations contained in the Vanguard Parties' dated, endorsed and signed MCO copies, which reliance was standard industry practice and custom.

57. Daimler is entitled to a money judgment against the Vanguard Parties for its economic damages in amounts to be determined at trial.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment – Against All Defendants)

58. Daimler repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

59. The Federal Declaratory Judgment Act (28 U.S.C. § 2201) empowers federal courts to "declare the rights and other legal relations of any interested party seeking such a declaration."

60. There is a substantial controversy between Daimler and the Vanguard Parties concerning the legal ownership of the trailers that KAL Trailers failed to pay for and which serves as Daimler collateral. This substantial controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, including, without limitation, because CIMC has been reselling certain of Daimler collateral to third parties, purportedly free and clear of Daimler's prior perfected liens.

61. In the event this Court denies Daimler's request for a money judgment against the Vanguard Parties, Daimler requests a declaratory judgment:

a. That the Vanguard Parties are equitably estopped from asserting title or other interests in the Daimler collateral superior to Daimler's interests;

b. That Daimler has a first-priority, properly perfected, security interest in the Daimler collateral;[1]

c. That CIMC must turn over possession of the Never Delivered Trailers in its possession to Daimler;

d. That the sale of King Country Disputed Trailers to King Country by CIMC was subject to the first-priority, perfected security interests of Daimler in such trailers; and

e. That CIMC must pay Daimler the proceeds of its sale of the King Country Disputed Trailers to CIMC.

**<u>FOURTH CAUSE OF ACTION</u>**

**(Conspiracy – Against All Defendants)**

62. Daimler repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

63. The Vanguard Parties and the KAL Entities[2] worked together in coordination to make false representations and material omissions to induce Daimler to extend purchase money loans secured by the Daimler collateral.

64. The Vanguard Parties and the KAL Entities intended that the KAL Entities use the dated, endorsed and signed MCO copies to obtain financing from Daimler for the Daimler collateral to which Daimler's security interests would never properly attach (according to the Vanguard Parties), allowing the Vanguard Parties and the KAL Entities to retain the illicitly obtained Daimler loan proceeds for themselves.

---

[1] The asserted retention of titles by the Vanguard Parties is limited in legal effect to the retention of security interests, which were unperfected and unknown to Daimler when Daimler advanced its purchase money loans and obtained its security interests; accordingly, the Vanguard Parties' security interests, if any, are subordinate to Daimler's security interests in the Daimler collateral.

[2] For the avoidance of doubt, Daimler is not pursuing any causes of action herein against any of the bankrupt KAL Entities.

65. Daimler reasonably relied on the false representations and material omissions made by the Vanguard Parties and, as a result, extended purchase money loans to KAL Freight for which it has not been repaid.

66. Daimler has been damaged as a direct and proximate result of the acts and omissions of the Vanguard Parties.

67. Accordingly, Daimler requests a money judgment against the Vanguard Parties for economic damages measured by its loan losses attributable to its loans to KAL Freight in an amount not less than $46,772,200.00, plus accrued but unpaid interest, exemplary damages, fees and costs, all in amounts to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(Money Had and Received – Against CIMC Only)**

68. Daimler repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

69. CIMC received money from its resale of the King Country Disputed Trailers to King Country, purportedly free and clear of Daimler's liens on the King Country Disputed Trailers.

70. The money that the Vanguard Parties received from their resale of the King Country Disputed Trailers to King Country, in equity and good conscience, belongs to Daimler.

71. Daimler seeks liquidated damages from CIMC in the amount of the money received by them from the resale of the King Country Disputed Trailers, plus interest.

**PRAYER FOR RELIEF**

WHEREFORE, Daimler prays for the following:

1. Money judgment against the Vanguard Parties for Daimler's economic damages, including its KAL Freight loan losses on loans secured by Vanguard and CIMC trailers in an amount not less than $46,772,200.00, plus accrued but unpaid interest, costs, and attorney's fees;

2. Exemplary damages;

3. A declaratory judgment that (i) the Vanguard Parties are equitably estopped from asserting superior title or interests to the Daimler collateral; (ii) Daimler has a first-priority, properly perfected security interest in the Daimler collateral; (iii) the attempted sale of the King Country Disputed Trailers to King Country by CIMC was void or, alternatively, subject to the first priority, perfected security interests of Daimler in such King Country Disputed Trailers; (iv) CIMC must turn over possession of all Undelivered Trailers in its possession to Daimler, and (v) CIMC shall pay Daimler the proceeds of sale of the King Country Disputed Trailers received by it;

4. Costs and fees as allowed by law; and

5. Such other and further relief as the Court deems just and equitable.

Dated: April 9, 2026

**FOLEY & LARDNER LLP**

/s/ *F. Phillip Hosp*
F. Phillip Hosp

Attorneys for Plaintiff
DAIMLER TRUCK FINANCIAL SERVICES USA LLC